[Cite as *State v. Cousins*, 2019-Ohio-2899.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| JONATHON COUSINS | : | Case No. 18-CA-95 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Court of Common
Pleas, Case No. 17 CR 743

JUDGMENT:    Affirmed

DATE OF JUDGMENT:    July 16, 2019

APPEARANCES:

For Plaintiff-Appellee

PAULA M. SAWYERS
20 South Second Street
Fourth Floor
Newark, OH 43055

For Defendant-Appellant

KATHERINE L. WOLFE
1350 West 5th Avenue
Suite 330
Columbus, OH 43212

*Wise, Earle, J.*

{¶ 1}  Defendant-Appellant, Jonathon Cousins, appeals his August 29, 2018 convictions in the Court of Common Pleas of Licking County, Ohio.  Plaintiff-Appellee is state of Ohio.

### FACTS AND PROCEDURAL HISTORY

{¶ 2}  On August 31, 2017, the Licking County Grand Jury indicted appellant on one count of felonious assault in violation of R.C. 2903.11, two counts of domestic violence in violation of R.C. 2919.25, and one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16.  Said charges arose from an incident involving appellant and his wife's grandfather, Donald Rostofer.

{¶ 3}  A jury trial commenced on August 28, 2018.  The jury found appellant guilty of the felonious assault count and the handling count, and not guilty of the domestic violence counts.  The trial court filed a judgment entry of conviction on August 29, 2018.  By judgment entry filed October 5, 2018, the trial court sentenced appellant to an aggregate term of two years in prison.

{¶ 4}  Appellant filed an appeal and this matter is now before this court for consideration.  Assignments of error are as follows:

I

{¶ 5}  "THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF EVIDENCE."

II

{¶ 6}  "THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS."

I, II

{¶ 7}   In his two assignments of error, appellant claims his convictions are against the sufficiency and manifest weight of the evidence.  We disagree.

{¶ 8}   On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction.  *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 9}   On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).  The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *Martin* at 175.

{¶ 10} We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact.  *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990).  The trier of fact "has the best opportunity to view the demeanor, attitude, and

credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶ 11} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(1): "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn."  R.C. 2901.22(B) defines "knowingly" as:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 12} R.C. 2901.01(A)(5) defines "serious physical harm to persons" as:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 13} Appellant was also convicted of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(B): "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle."

{¶ 14} Eleven witnesses testified during the trial. The first witness, Newark City Police Sergeant Clint Eskins, was the responding officer to a domestic situation call. T. at 100. When he arrived on the scene, appellant pulled up in his pickup truck. T. at 101. Appellant told Sergeant Eskins he and his wife Abby had been arguing when Abby's grandfather Donald grabbed him by the neck. T. at 102. Appellant reacted and struck Donald. *Id.* Sergeant Eskins testified appellant's hand was swollen and appeared to be broken. *Id.* Sergeant Eskins observed injuries to Donald's face. T. at 106. Donald's eye and nose area was red and swollen. T. at 107; State's Exhibit 4.

{¶ 15} When Sergeant Eskins asked appellant if he had any weapons in his vehicle, appellant stated, "there was an old handgun in the vehicle in the glove box." T. at 107. Sergeant Eskins testified he secured the firearm from the vehicle along with "a loaded magazine with rounds inside the truck, as well." T. at 103; State's Exhibits 1 and 2. The loaded magazine was in the gun. T. at 104. Appellant did not have a permit to

carry the firearm. T. at 105. Sergeant Eskins testified the firearm would be within appellant's reach when he was driving the vehicle. T. at 106.

{¶ 16} Newark City Police Detective Timothy Elliget is a criminalist. T. at 116. He performed an operability test on the firearm retrieved from appellant's vehicle. Detective Elliget testified the firearm was operable and fully functional. T. at 118-119; State's Exhibit 3.

{¶ 17} Donald Rostofer, the grandfather, was seventy-two years old at the time of trial. T. at 121. He testified appellant and Abby were living with his daughter Shelly and her husband Roy. T. at 124. Donald was over most weekends to help with a kitchen remodel. T. at 125. He was aware that prior to his arrival on the day in question, all of the parties had been arguing. T. at 126. As he began working in the kitchen, appellant and Abby were leaving the house. T. at 126-127, 141-142. On the way out, Abby stopped to say something to her grandmother Lee. T. at 127. Donald testified he observed appellant grab Abby's arm and say "come on" and Abby saying a couple times she did not want to go and telling appellant he was hurting her. T. at 127, 143-144. Donald grabbed Abby's arm and told appellant, " 'Just go calm down. She doesn't want to go.' " *Id.* That was the last thing he remembers because appellant hit him on his right temple and knocked him out. T. at 127-128. When he came to, he was bleeding from his forehead, under his eye, and his nose. T. at 130; State's Exhibits 4 and 5. He sustained bruising and abrasions, a concussion, facial fractures on his left side, headaches, and a brain bleed. T. at 131, 133, 135, 147. He testified he did not put his hands on appellant or try to pry his grip off of Abby's arm. T. at 144.

{¶ 18} Dr. Steven Hazelcorn, an emergency room physician at Licking Memorial Hospital, treated Donald following the incident. T. at 151. He testified to the injuries sustained by Donald and the seriousness of those injuries. T. at 152-159. Donald "ended up with a subdural hematoma." T. at 155. Dr. Hazelcorn testified a subdural hematoma can cause death. T. at 157. The fractures to Donald's face were "serious, especially at that age. It could also lead to entrapment of the eyeball." T. at 158. Dr. Hazelcorn opined the subdural hematoma was "much more serious," and it was caused by the trauma to the head during the incident with appellant. T. at 158, 160.

{¶ 19} Abigail "Abby" Athey, appellant's wife at the time of the incident, ex-wife at the time of trial, testified to the argument she had with appellant prior to the incident with her grandfather. T. at 170-172. As appellant and Abby were leaving the house, appellant "aggressively" pulled on her arm and she asked him to let go because she did not "want to go anymore." T. at 173. Abby testified her grandfather observed what was happening, came over to try and calm down appellant, and pushed appellant's shoulder. T. at 173-174. Appellant said, " 'Don't touch me' " and as her grandfather continued to attempt to calm him down, appellant punched him. T. at 174-175. Donald stumbled out into the sunroom and appellant punched him again, punched him a third time, and then Donald blacked out and "fell flat on his face." T. at 175-176. Abby's father Roy attempted to protect Donald and he also fell to the floor. T. at 176. Appellant punched Roy's back and the back of his head until Abby's mother Shelly pulled appellant off. *Id.* Appellant ran out and then came back, yelling to Abby "to get his stuff." *Id.* Abby collected his stuff, ran out and gave it to appellant, and he ran away. T. at 176-177. Abby was cross-examined with her statement to police which did not mention the argument prior to the incident or

that appellant punched her grandfather multiple times.  T. at 186-191, 195; Defendant's Exhibit B.  In the middle of her statement, Abby wrote, " 'I was mad and upset and basically Jon was being a good husband that day.' "  T. at 195.  Abby explained she wrote that because she was scared and nervous and "didn't really know what I wanted to write down. My mind was everywhere."  T. at 196.  On redirect, Abby acknowledged that she wrote in her statement that appellant threw "fists" at her grandfather, as in multiple attempts to hit him.  T. at 199.

{¶ 20} Roy Athey, Abby's father, testified to arguing with appellant and Abby prior to the incident.  T. at 205-206.  He was working in the kitchen when he heard arguing in the sunroom.  T. at 206.  Roy went out and observed appellant hit Donald in the face.  T. at 206-207.  Roy attempted to break up the fight, but appellant punched Donald again. T. at 207.  Roy got in between the two and appellant struck Donald a third time, causing him to stumble and fall down.  *Id.*  When Donald fell, Roy fell with him.  *Id.*  Appellant then hit Roy in the back and the back of his head until his wife Shelly pulled appellant off.  T. at 208.  Appellant left and then came back around and threatened to kill all of them.  T. at 209.  The comment made him feel "pretty scared" because he knew appellant had guns. *Id.*  Roy was cross-examined with his statement to police which did not mention that appellant punched Donald multiple times.  T. at 220-221; Defendant's Exhibit C.  Roy explained at the time of writing his statement, "everything happened so fast that I was shaking and everything and I just wrote down.  I started writing down stuff."  T. at 222.

{¶ 21} Leota "Lee" Rostofer, Donald's wife, testified on the way out of the house, Abby started arguing with her.  T. at 232.  After, Lee observed appellant pulling on Abby's arm and telling her to "come on," Abby saying she did not want to go, her husband holding

on to Abby's arm and trying to calm appellant down, and appellant hitting her husband in the head and "continued on hitting him." T. at 232-233. She saw her husband on the floor face down and Roy was on top of him trying to protect him. T. at 233. Appellant hit Roy in the head until Shelly pulled him off. *Id.* Appellant left and then came back around and threatened to kill all of them. T. at 234. The comment terrified her because she knew appellant had guns. *Id.* She did not see any contact from her husband to appellant prior to the punch. T. at 239. Lee was cross-examined with her statement to police which did not mention that appellant punched Donald multiple times. T. at 243-244; Defendant's Exhibit A. Lee explained at the time of writing her statement, she was "just so upset." T. at 241.

{¶ 22} Michele "Shelly" Athey, Abby's mother, testified to arguing with appellant and Abby prior to the incident. T. at 250-252. She did not observe the altercation between appellant and her father, but she could hear them arguing. T. at 253. By the time she got to the sunroom, her father was face down on the floor and Roy was on top of him. T. at 254, 266. Appellant hit Roy in the back and the back of his head until she pulled him off. T. at 254. Appellant left and then came back around and threatened to kill all of them. T. at 255. The comment scared her because she knew appellant had guns. *Id.*

{¶ 23} Appellant testified on his own behalf. Appellant was twenty-four years old at the time of trial. T. at 304. He had served in the Army and had received specialized training such as hand-to-hand combat and attack and defend skills. T. at 304, 342-343. Appellant testified prior to the incident, Abby's parents Roy and Shelly had been yelling at him so he fled to his bedroom and locked the door. T. at 315. Abby was in the room with him, and they were not arguing. *Id.* Roy and Shelly began "beating" on the bedroom

door and telling them "to get out of there" before they retreated and went "back up front." T. at 316. Appellant was "very upset" and ready to leave. *Id.* He and Abby walked through the house to leave when Abby got into an argument with her family. T. at 317-318. Appellant testified two times he grabbed Abby's arm and said "come on" and both times she "jerked away and continued yelling at her family." T. at 318-319. He then picked up Abby and moved her onto the sunporch and stood between her and her family. T. at 319-320. Abby never stated she did not want to leave. T. at 319. Donald said something derogatory to appellant and grabbed his shirt "and kind of did like a shove - - shove kind of pull thing, and I stiff armed him off of me and I told him, 'We're leaving'." T. at 321. Appellant testified Donald "proceeded to grab my shirt, and when he grabbed my shirt for a demonstration, he put his fist up underneath my throat and attempted to lift me off the ground to where my tippy toes were up." *Id.* As appellant attempted to get away from Donald, Donald "grabbed the back of my head and pulled me into his chest." T. at 322. Appellant thought his life was in danger and he started suffocating so he "swung up forward" with his right arm and made contact with the left side of Donald's face. T. at 322-323. Donald let go, fell to the ground, and landed on the right side of his face. T. at 323. Appellant stated he hit Donald only once. T. at 333. Appellant testified he was not trying to hurt anyone, he just wanted to get away. T. at 325. He attempted to make sure Donald was okay when he heard Roy yelling and charging him. T. at 324. They then had an altercation. T. at 325-326. Shelly came in and shoved appellant. T. at 326. Appellant rushed out of the house and then ran back in to retrieve his book bag. T. at 326. He then went to his truck and returned to the house to have Abby hand him his keys and phone and "stuff." T. at 326-327. Donald came out with a towel against his head and went after

appellant, "shoving me up against the back of his truck." T. at 329. Appellant had his hands up and told him he was going to hit him again. *Id.* Donald continued to shove him and Roy had to hold him back. *Id.* Appellant left and then returned to the house to defend himself and tell the police his side of the story. T. at 330. While he was gone, he took his loaded firearm out of his book bag and placed it in his glove compartment. T. at 331, 339. He thought Ohio was an open carry state. T. at 331. Appellant testified he was never trying to hurt anyone, he had an honest belief that he was in imminent danger of bodily harm, and he did nothing to create the situation. T. at 333. Appellant stated he never threatened to kill them. T. at 335. The entire time, he was "trying to alleviate the hostility and just get away." T. at 335.

{¶ 24} The jury was instructed on the affirmative defense of self-defense. T. at 397-400. As explained by this court in *State v. Lawyer,* 5th Dist. Licking No. 2018 CA 00030, 2019-Ohio-597, ¶ 29:

> To establish self-defense in the use of non-deadly force, the accused must show: 1) he was not at fault in creating the situation giving rise to the altercation; 2) the accused had reasonable grounds to believe and an honest belief, even though mistaken, that some force was necessary to defend himself against the imminent use of unlawful force; and 3) the force used was not likely to cause death or great bodily harm. *State v. Hoopingarner,* 5th Dist. Tuscarawas No. 2010AP 07 00022, 2010-Ohio-6490, ¶ 31, citing *State v. Vance,* 5th Dist. Ashland No. 2007-COA-035, 2008-Ohio-4763, ¶ 77 (citations omitted). If any one of these elements is

not proven by a preponderance of the evidence, the theory of self-defense does not apply. *State v. Williford,* 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990).

{¶ 25} Appellant argues the testimony was inconsistent regarding the felonious assault conviction. As noted above, the jury is entrusted with determining the credibility of the witnesses. It is undisputed appellant struck Donald. As a result, Donald required medical attention and Dr. Hazelcorn testified to the seriousness of his injuries. "Ohio courts have also determined that 'serious physical harm' exists where the injuries caused the victim to seek medical treatment." *State v. Nicholson,* 5th Dist. Morgan No. 18 AP 0005, 2019-Ohio-1058, ¶ 22, citing *State v. Scott,* 4th Dist. Washington No. 15CA2, 2015-Ohio-4170, ¶ 23. Further, "Ohio courts have held that it is a foreseeable consequence for someone to fall to the ground after being punched in the head or pushed." *Nicholson* at ¶ 23. It was up to the jury to accept appellant's self-defense claim. The jury heard inconsistent testimony and it was within the jury's province to accept the version of the incident as presented by appellee.

{¶ 26} As for the improperly handling a firearm in a motor vehicle conviction, appellant argues there was no evidence as to whether the glove box was locked or not, rendering the gun accessible. Sergeant Eskins did not testify to having any trouble retrieving the firearm from the glove box. He testified the gun would be within appellant's reach when he was driving the vehicle. Appellant did not testify to locking the glove box after he placed the loaded gun inside.

{¶ 27} Upon review, we find there is sufficient evidence, if believed, to support the convictions beyond a reasonable doubt.  In weighing the evidence presented, we do not find the jury lost its way and created a manifest miscarriage of justice.

{¶ 28} Assignments of Error I and II are denied.

{¶ 29} The judgment of the Court of Common Pleas of Licking County, Ohio is hereby affirmed.

By Wise, Earle, J.

Gwin, P.J. and

Hoffman, J. concur.

EEW/db 627